Minnie Lee THOMPSON, et al., Plaintiffs,

v.

Jerry LANCASTER, et al., Defendants.

Civ. A. No. 85–154–1–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Feb. 5, 1987.

Don C. Keenan, Atlanta, Ga., for plaintiffs.

Charles M. Stapleton, Macon, Ga., J. Johnson Hall, Hawkinsville, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

Plaintiff Minnie Lee Thompson has brought this 42 U.S.C. § 1983 action in order to recover from defendant Jerry Lancaster, Sheriff of Pulaski County, damages resulting from the death of her daughter, Paulette Adams. Plaintiff alleges that as a result of defendant's reckless and grossly

negligent conduct, plaintiff's daughter was killed. As to these allegations, defendant has filed a motion for summary judgment.

Courts may grant motions for summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of demonstrating that no genuine issue of material fact exists in the case. *Thrasher v. State Farm Fire and Casualty Co.*, 734 F.2d 637, 638 (11th Cir.1984). When determining whether this burden is met, courts should review the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Id.* Furthermore, the Supreme Court has recently clarified Rule 56(c) by saying that summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, — U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). With this standard in mind, the court must determine whether the facts of record demonstrate that plaintiff has met her burden under Rule 56(c) in order to go forward with her case.

## Factual Background

Paulette Adams lived with Dudley Wood in Pulaski County, Georgia from February or March of 1980 until early April of 1983. Ms. Adams and Mr. Wood were not married during this time period. In early April of 1983, Ms. Adams left Mr. Wood and moved in with her mother and stepfather, Mr. and Ms. Thompson. At the time of their separation, Ms. Adams was allegedly assaulted by Mr. Wood.

Following her moving in with her parents, Mr. Wood began parking outside of the Thompson residence. There is evidence that Mr. Wood made certain threats to people while parked in front of the Thompson residence. Mr. Thompson contacted defendant about these incidents, but the exact nature and content of these communications is unclear.

Mr. Wood subsequently approached defendant for help in resolving his relationship with Ms. Adams, whereupon, defendant arranged to have Ms. Adams meet with Mr. Wood in his office. At this meeting defendant had Ms. Adams speak privately with Mr. Wood. The evidence is disputed as to whether this meeting ended peacefully or with Ms. Adams in tears. The Thompsons stated that at this meeting they warned defendant of Mr. Wood's violent tendencies.

Following this meeting, Mr. Wood contacted defendant and informed him that he was going to burn Ms. Adams' personal belongings unless she came to recover them from his home. Defendant and a deputy accompanied Ms. Adams to Mr. Wood's home in order to recover her personal items. Upon arriving at the scene, Ms. Adams noticed that Mr. Wood had a bottle of pills in his hand. She believed that he would try to commit suicide and tried to take them away from him. He pushed her away and took a handful of pills. She returned home without her possessions and Mr. Wood went into the hospital. Mr. Wood testified that "after I tried to commit suicide, [Ms. Adams] knew that I was capable of anything." Mr. Wood had also threatened to kill Ms. Adams if she did not come back to him.

These were the events leading up to the May 3, 1983, incident. On this date, Mr. Wood telephoned defendant stating that if Ms. Adams did not come to get her belongings he would burn them. Defendant then contacted Ms. Adams about Mr. Wood's phone call. The defendant, his deputy, and Ms. Adams subsequently drove to Mr. Wood's trailer. Once they arrived, Ms. Adams began collecting her belongings in the presence of defendant, the deputy, and Mr. Wood. While she was in the back of the trailer defendant received a call on his police radio concerning an incident. Defendant left to answer the call, leaving the deputy to handle Mr. Wood. It is not clear whether defendant apprised the deputy of

any possible danger concerning Mr. Wood. After defendant had left, Mr. Wood ran to the back of the trailer and locked himself and Ms. Adams in a back room. When the deputy tried to enter, Mr. Wood threatened to shoot the deputy. The deputy left the trailer and ran to a nearby home to get help. By the time help arrived, Mr. Wood had fatally shot Ms. Adams and had shot himself in an attempt to commit suicide. Mr. Wood survived his self-inflicted gunshot wound and was charged with murder. He pled guilty and was sentenced to a term of life imprisonment. Mr. Wood had been the subject of several criminal warrants prior to this incident, and it appears that defendant was aware of these allegations of violence against Mr. Wood.

### Deprivation of Life and Liberty Without Due Process

█ In the present case, plaintiff alleges that defendant Lancaster deprived Ms. Adams of her life and liberty without due process of law. Looking at Ms. Adams' liberty interest claim first, it is clear that the Fourteenth Amendment protects certain liberty interests from governmental action. The liberty interests secured by the Fourteenth Amendment are those traditional negative liberties dealing with one's right to be left alone. *See Jackson v. City of Joliet,* 715 F.2d 1200, 1203–04 (7th Cir. 1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). The Constitution of the United States has never been construed to mandate that the state must provide certain positive liberties, *i.e.,* the right to the elementary protective services customarily provided for by the state. Accordingly, a claim by a plaintiff that the state did not provide certain governmental services, or inadequately provided those services, and death ensued as a proximate result, would not be cognizable under section 1983 because the state had no constitutional obligation to provide these services. *Id.* In other words, the Fourteenth Amendment does not create a duty upon the state to provide, for example, police protection, and, therefore, Ms. Adams' death did not result from any breach of the state's duty to provide such protection. Plaintiff's claim for deprivation of these services, therefore, must fail because Ms. Adams did not have a liberty interest in these services. Furthermore, plaintiff has not alleged any facts that would demonstrate that any of her negative liberty interests, arising out of her right to be left alone, were deprived, without due process, by any governmental action. The evidence is clear that Ms. Adams freely consented to defendant's help in resolving her dispute with Mr. Wood. *See* discussion *infra,* at 706–07. Any restraint on her liberty was purely consensual, and, accordingly, insufficient as a matter of law to support a claim for deprivation of one's liberty interest without due process.

Plaintiff's claim of deprivation of life without due process, however, requires closer scrutiny than her liberty interest claim. While plaintiff has no more constitutional right to the protective services many states provide their citizens in her deprivation of life claim than in her liberty interest claim, plaintiff argues that she has presented evidence that satisfies the elements necessary to demonstrate an exception to this general rule.

█ This exception was recently noted by the Eleventh Circuit in *Bradberry v. Pinnellas County,* 789 F.2d 1513 (11th Cir. 1986), wherein the circuit court stated that "when a municipality is alleged to have grossly negligently trained one of its agents who then takes affirmative action causing injury to an innocent bystander," this *may* constitute a valid cause of action under section 1983.[1] In other words, the courts make a distinction between the situation wherein the state actively places someone in danger and the situation wherein the state fails to help someone already exposed to risk. In the latter situation,

1. 789 F.2d at 1517. While the Eleventh Circuit did not come out and adopt this exception this court believes that the appellate court's specific delineation of an exception implies that such a cause of action under section 1983 would be found to exist. *Id.*

even if the state is grossly negligent in failing to rescue the person in danger, there is still no liability under 42 U.S.C. § 1983. In this case, however, it is clear that defendant brought Ms. Adams to the scene of the crime and that she was not in peril prior to defendant bringing her to Mr. Wood's home. Under these facts, the government's conduct may have created a "special relationship" with Ms. Adams, such that the Constitution would require the government to provide certain basic protective services to her. Failure to provide these services could constitute a violation of 42 U.S.C. § 1983. *Id.* at 1516, n. 2.

■ Plaintiff's claim, however, must fail for another reason. Even if the government was required to provide protective services to Ms. Adams when they brought her to Mr. Wood's home, if defendant was merely negligent in providing those services, defendant could not be held liable for Ms. Adams' death under 42 U.S.C. § 1983. *See Daniels v. Williams,* 474 U.S. 327, ——, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); and *Davidson v. Cannon,* 474 U.S. 344, ——, 106 S.Ct. 668, 669, 88 L.Ed.2d 677 (1986). Furthermore, these same Supreme Court cases hold that the term "negligence" must be given a broad definition. For example, the petitioner in *Davidson* had informed prison officials that other inmates had threatened him, and, thus the prison officials knew of possible dangers to him. Yet, despite these warnings, the prison officials took no action to protect *Davidson,* and he was eventually seriously injured by another inmate. While such conduct could have easily been deemed reckless, the Supreme Court found it merely negligent. *Davidson,* 474 U.S. at ——, 106 S.Ct. at 669. If "negligence" describes the conduct there, it must surely do so here. *Accord, Ortega v. Rowe,* 796 F.2d 765 (5th Cir.1986).[2] If defendant had left plaintiff completely unprotected at the Wood residence, this court might reach a different result from the one it reaches today. De-

fendant, however, did leave his deputy on the scene to protect Ms. Adams from Mr. Wood. While it is tragically clear that this protection was inadequate, section 1983 was not promulgated to afford a remedy under these facts. Accordingly, plaintiff's claim for deprivation of Ms. Adams' life without due process must be dismissed because she has not shown any facts that demonstrate defendant's conduct to be sufficiently egregious warranting relief under section 1983.

### Plaintiff's Unconstitutional Seizure Claim

■ Plaintiff also makes a claim under the Fourth and Fourteenth Amendment for an unconstitutional seizure of Ms. Adams' person by defendant on May 3, 1983, when she accompanied defendant to Mr. Wood's home. This court finds that the evidence clearly demonstrates that no such seizure, as would be recognized by the Fourteenth Amendment, occurred in this case. However unfortunate her decision was to accompany defendant to Mr. Wood's home that day, her will was not coerced by defendant's show of force or authority, nor was she ever seized by defendant sufficient to find a constitutional violation. *See U.S. v. Moeller,* 644 F.2d 518, *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981) (So long as a citizen is not restrained in any way or so long as his or her cooperation is not obtained by coercion, force, or other use of authority, a mere police-citizen contact is generally not within the protections of the Fourth Amendment.). She merely wished to get her personal belongings back from Mr. Wood. It is clear that she freely consented to accompanying defendant to Mr. Wood's home so long as defendant was present to protect her. There is no evidence to indicate that defendant, in any way, required her to go with him against her will. Rather, the evidence merely indicates that Ms. Adams

---

**2.** This broad definition of the term "negligence" is consistent with both the Supreme Court's and the Eleventh Circuit's reluctance in deciding what type of recklessness or gross negligence is

actionable under section 1983. *See, e.g., Daniels,* 474 U.S. at ——, 106 S.Ct. at 670, n. 3; and *Bradberry,* 789 F.2d at 1515, n. 1.

would not go absent police protection. Under these facts, plaintiff's claim for an unconstitutional seizure of Ms. Adams' person must fail, and summary judgment is properly granted to defendant on this issue.

In summary, defendant's motion for summary judgment on plaintiff's claim that Ms. Adams' liberty interest was deprived without due process is GRANTED, defendant's motion for summary judgment on plaintiff's claim that Ms. Adams' Fourth Amendment rights were violated is GRANTED, and defendant's motion for summary judgment on plaintiff's claim that Ms. Adams' life interest was deprived without due process is hereby GRANTED.