**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KIMBERLY KENNEDY, individually
and in her capacity as personal
representative of the estate and as
guardian for her children aka
Kimberly Gorton; JAY D.
KENNEDY, aka JD Kennedy; KEITH
TEUFEL; TERA TEUFEL,
                    *Plaintiffs-Appellees,*

v.

RIDGEFIELD CITY OF, a municipal
corporation and political
subdivision of the State of WA;
NOEL SHIELDS,
                    *Defendants-Appellants.*

No. 03-35333

D.C. No.
CV-01-05631-JKA
Western District
of Washington,
Tacoma

ORDER
WITHDRAWING
OPINION AND
DENYING
PETITION FOR
REHEARING
EN BANC

Filed March 7, 2006

Before: James R. Browning, A. Wallace Tashima, and
Jay S. Bybee, Circuit Judges.

Order;
Dissent by Judge Tallman

## ORDER

The opinion filed June 23, 2005, and amended September
12, 2005, appearing at 411 F.3d 1134 and 423 F.3d 1117
respectively, and the opinion concurring in part and dissenting
in part, appearing at 411 F.3d 1146, are withdrawn and may
not be cited as precedent by or to this court or any district

court of the Ninth Circuit. An opinion and dissenting opinion are published by separate order.

Judge Bybee votes to grant the petition for rehearing en banc. Judges Browning and Tashima recommend denying the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc, and a judge requested a vote on whether to rehear the matter en banc. The case failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. The petition for rehearing en banc is **DENIED**. No further petitions shall be entertained.

---

TALLMAN, Circuit Judge, with whom KOZINSKI, O'SCANNLAIN, KLEINFELD, GOULD, BYBEE, CALLAHAN, and BEA, Circuit Judges, join, dissenting from denial of rehearing en banc:

It is regrettable that the court declines to hear this case en banc. Contrary to Supreme Court precedent, the *Kennedy* opinion expands the judge-made "state-created danger" doctrine to impose impermissibly broad 42 U.S.C. § 1983 civil rights liability on police officers under circumstances that at most evidence negligence. Its expansive new holding opens the floodgates to § 1983 lawsuits by citizens who will claim deliberate indifference following any failure on the part of the police to adequately protect them from harm after they report a crime, notwithstanding that the danger of retaliation by criminal suspects often exists when citizens report crimes. *Kennedy* will all but foreclose officers from invoking qualified immunity before trial; a jury will have to decide whether to impose liability and damages.

The slippery slope of liability created by the court's opinion has implications of great magnitude for public safety offi-

cers everywhere and the ruling cannot be confined to extraordinary cases. This unjustifiable expansion of the state-created danger doctrine raises the possibility of liability every time a person dials 9-1-1 or reports a crime to law enforcement and the police are delayed in their response or follow-up investigation. These delays are often unavoidable due to other emergency calls, the press of pending cases, and inadequate resources to handle them all.[1]

Like many § 1983 cases, the facts giving rise to this litigation are "undeniably tragic." *E.g.*, *Town of Castle Rock v. Gonzales*, 125 S. Ct. 2796, 2803 (2005) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 191 (1989)). Kimberly Kennedy called the Ridgefield Police Department, a small-town police agency in southwest Washington (with five full-time officers), in September 1998, alleging that her 13-year-old neighbor, Michael Burns, had molested her nine-year-old daughter. Ridgefield police officer Noel Shields responded to the call. Kennedy claims that she warned Officer Shields that Burns and his mother had dangerous tendencies. Kennedy alleges that Officer Shields assured her that she would be given notice prior to any contact with the Burns family by investigators who would follow up on her allegations. Shields prepared a report which he forwarded to the Child Abuse Intervention Center ("CAIC"), an interagency law enforcement unit which investigates and prosecutes felony child abuse cases for Clark County and the City of Vancouver, Washington.

---

[1] In Seattle alone, the city responded to approximately 820,000 calls to 9-1-1 in 2002. City of Seattle, Seattle Police Department, *at* http://www.seattle.gov/police/Units/communications.htm (last visited Feb. 14, 2006). In San Francisco, the Emergency Communications Department of the city and county processed over one million emergency calls for their police and fire departments annually as of 2003. Press Release, Emergency Communications Department, San Francisco's Emergency Communications Department's Wireless E9-1-1 Readiness (Nov. 20, 2003), *available at* http://www.sfgov.org/site/ecd_page.asp?id=21382.

After Kennedy left a telephone message with Officer Shields inquiring about the progress of her case, he decided to drive to the Kennedy house to personally inform her that he had called the CAIC but did not know the status of the case. On the way to Kennedy's home, Shields decided to stop by the Burns residence to see whether the CAIC had contacted the family pursuant to its on-going investigation of Kennedy's allegations. After speaking with Burns and his mother, Officer Shields immediately proceeded to the Kennedy house to meet with Kennedy and inform her of the contact.

Kennedy was concerned that Burns posed a threat to her family now that he knew of her complaint, and she alleges that Officer Shields assured her during this conversation that the police would patrol her neighborhood that evening. Officer Shields testified on deposition that he and a reserve officer were unavoidably out of service for most of the evening while booking an unrelated arrestee and there were no other officers on duty in the small town that night.

Early the next morning, Burns broke into the Kennedy house and shot Kimberly Kennedy and her husband, Jay, while they slept. Jay Kennedy died as a result of his injuries; Kimberly survived. Burns was convicted of the premeditated murder of Jay Kennedy and attempted premeditated murder of Kimberly Kennedy.

Kimberly Kennedy brought an action in Washington state court under § 1983 against the City of Ridgefield, Officer Shields, and others. The case was removed to federal district court. The trial court denied the motion to dismiss in which Officer Shields sought qualified immunity. A divided panel of our court affirmed the judgment of the district court on interlocutory appeal, holding that Officer Shields can be held liable under the state-created danger doctrine for revealing the molestation allegations to Burns and his mother prior to notifying Kennedy.

We were reversed in *Saucier v. Katz*, 533 U.S. 194 (2001), for improperly applying Supreme Court precedent when evaluating the circumstances under which qualified immunity applies. *See id.* at 202 ("The approach the Court of Appeals adopted . . . could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). The Court directed us to apply a two-step process whenever we analyze an entitlement to qualified immunity. First, we are to evaluate whether the officer's conduct violated a constitutional right. Next, we look to whether the constitutional right was clearly established. In *Kennedy*, because no constitutional right can be established under the first step, the second step need not be reached. *Id.* at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

Established Ninth Circuit parameters have further limited the first step. The state-created danger doctrine requires more than a mere failure to act; it requires the state official to take an affirmative action. *See Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997) ("[I]f affirmative conduct on the part of a state actor places a plaintiff in danger, and the officer acts in deliberate indifference to that plaintiff's safety, a claim arises under § 1983."). Second, the plaintiff must prove that the official's act did more than simply expose the plaintiff to a danger that already existed. *See L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992); *see also Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir. 1990). Finally, the plaintiff must prove that the official acted with deliberate indifference to known or obvious dangers. *See L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996) ("[T]he plaintiff must show that the state official participated in creating a dangerous condition, and acted with deliberate indifference to the known or obvious danger in subjecting the plaintiff to it.").

The Supreme Court has stated that negligence, whether gross or simple, is insufficient to prove a constitutional violation. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." (emphasis omitted)). In *DeShaney*, the Court highlighted that the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." 489 U.S. at 195. Even if a state official refuses to provide protective services that could avert injuries, the government cannot be held liable under § 1983. *Id.* at 196. Thus, "[n]ot only does the word 'deprive' in the Due Process Clause connote more than a negligent act, but we should not 'open the federal courts to lawsuits where there has been no affirmative abuse of power.' " *Daniels*, 474 U.S. at 330 (quoting and overruling *Parratt v. Taylor*, 451 U.S. 527, 548-49 (1981)).

While there is no hard and fast line for liability in these sorts of cases, it should be evident that liability cannot attach here where no "conscience shocking" abuse of power can be alleged. In *County of Sacramento v. Lewis*, the Supreme Court said:

> Rules of due process are not . . . subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

523 U.S. 833, 850 (1998) (refusing to impose civil rights liability on officers involved in high-speed chases of fleeing fel-

ons). Where another party is the source of the danger, the state official cannot be held liable. *See DeShaney*, 489 U.S. at 202-03 ("Judges . . . are moved by natural sympathy . . . to find a way for [victims] to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the [state], but by [a third party]."); *see also Bradberry v. Pinellas County*, 789 F.2d 1513, 1514-15, 1518 (11th Cir. 1986) (declining to impose § 1983 liability upon a lifeguard or the county because "[t]he state did not kill [the decedent], the ocean did").

Even if some affirmative "danger-creating" behavior on the part of Officer Shields can be proven, by no means may he be held liable. Officer Shields did not create the threat of harm from Burns. That threat was inevitable when Burns' misconduct was reported as a crime by Mrs. Kennedy; retaliation from Burns against the complainant was a danger faced by the Kennedys in the "free world." *DeShaney*, 489 U.S. at 201; *see also id.* at 197 ("[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."); *Penilla*, 115 F.3d at 710 ("The critical distinction is not . . . an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk.").

It was the all-but-inevitable notice to the Burns family,[2]

---

[2]The subject of a criminal investigation will almost always receive notice of the charge or complaint made against him. Contact is a necessary part of virtually all police investigations, particularly in a child abuse case like this one, where the only likely witnesses to the alleged criminal acts are the two children involved. While the timing of the contact may vary due to the circumstances of the particular case and the investigative strategy to be employed, the eventual notice to the subject of the investigation must be presumed. It will happen in all cases where charges are filed, as the Constitution requires; it is only in the event that charges are never filed that the subject might not receive notice that he was under investigation.

provided by Officer Shields in response to Kennedy's allega-
tions of child molestation, that our court finds sufficient to
constitute the affirmative conduct that exposes Officer Shields
to § 1983 liability. However, based upon the Supreme Court's
clear standards, we should not have held that where an ongo-
ing criminal investigation is underway the state can create a
danger simply by contacting the subject of the investigation.
*See DeShaney*, 489 U.S. at 195-96 (declining to expand the
scope of liability under the Due Process Clause because his-
torical analysis reveals that "the Due Process Clause of the
Fourteenth Amendment was intended to prevent government
from abusing [its] power, or employing it as an instrument of
oppression" (alteration in original) (internal quotation marks
and citations omitted)); *see also Collins v. City of Harker
Heights*, 503 U.S. 115, 125 (1992) ("[T]he Court has always
been reluctant to expand the concept of substantive due pro-
cess because guideposts for responsible decisionmaking in
this unchartered area are scarce and open-ended."). As Judge
Bybee aptly observes in his dissent from the court's opinion,
it is absurd to hold that merely meeting with the Burns family
prior to notifying Kennedy, a "flipflop of no more than fifteen
minutes[,] is of constitutional magnitude." Bybee, J., dissent
at 2264, 2269 n.8.

While the fundamental framework set forth by the Supreme
Court in *Saucier* defines the narrow scope of state official lia-
bility under the state-created danger doctrine, the limited
applicability of this doctrine is further evidenced by our cir-
cuit's usual willingness to find that an official is protected by
qualified immunity. *See id.* at 2250 ("In the sixteen years
since we introduced the state-created danger exception to
*DeShaney* into our case law, we have approved its application
on fewer than five occasions."). The reason for limiting the
state-created danger doctrine is clear: An expansion will deter
government officials from taking risks and executing their
functions for the public good. In fact, we have an entire body
of retaliation laws in the criminal codes of every jurisdiction
recognizing the inherent danger, and imposing responsibility

on the actual perpetrator of the violence, for which the court now imposes civil rights liability on the hapless officer who has the misfortune to take the initial complaint and conduct a follow-up investigation.

Because the court fails to abide by the Supreme Court's directive and has acted in a manner contrary to our established circuit precedent, creating substantial risk of liability for public servants through its unwarranted expansion of the state-created danger doctrine, I must respectfully dissent from the denial of rehearing this important case en banc.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West.